# EXHIBIT A

Mehri & Skalet

Mehri & Skalet, PLLC

Michael Lieder, Partner
mlieder@findjustice.com
202.822.5100

December 11, 2025

**VIA ELECTRONIC MAIL ONLY**

Shemori Corinthian
J. Kevin Shaffer
100 Church Street, Room 2-188
New York, New York 10007
(212) 356-4076
scorinth@law.nyc.gov
jshaffer@law.nyc.gov

*Re: The City's Production of Information from Excel Spreadsheets*

Dear Shemori and Kevin:

We write in response to Shemori's December 9th email stating that you are addressing with DSNY our concerns about the documents produced in response to our RFPs. We have expressed some of those concerns previously both in writing and in a virtual meet-and-confer. But since then, we have had a chance to review many of the documents that Plaintiffs and the City produced. This review has strengthened and broadened our belief that the City, especially the agency, did not do an adequate job of searching for documents. This letter expands on our prior comments, in many instances pointing to documents that have been produced to support our belief that the City must have a great deal of other responsive documents. We hope that the letter will help you in addressing our concerns with the agency.

Granted, some of these documents may be produced as part of an ESI production after the parties agree on ESI search strings and the ESI searches are performed. But ESI searches using search strings almost certainly will miss some, perhaps many, responsive documents and we are unwilling to rely on ESI searches alone.

Also, you should not regard our descriptions below as a complete list of documents in the City's possession that have not been produced, partly because we are relying largely on documents produced by Plaintiffs. Plaintiffs haven't had access to all the types of responsive documents that the City possesses, especially documents reflecting internal deliberations that result in policies issued to Agents. Plaintiffs generally are aware only of the end results of deliberations. Omission of any particular type of document that the City may possess does not waive our request for all documents responsive to each RFP. Rather, it means only that we have no specific reason now to believe that the City has documents responsive to an RFP that it has not produced.

First Set of Document Production Requests

1. In other cases, the City has produced HR and payroll data on proposed class members and comparators, and there is no reason to think it cannot do so here. If the City's HR and payroll datasets lack a means to distinguish between SPs and other SWs, the City should link the SW data with other records possessed by DSNY identifying SPs.

5. Plaintiffs have produced numerous documents from an Enforcement Division executive or other executives to Agents, or to Agents and SPs, ordering changes in their tasks or duties or identifying areas of concern or emphasis about those tasks and duties. Many of these orders or other documents were meant for reading at roll call. It is doubtful, however, that Plaintiffs have a complete set and hence the City should produce them. This RFP also encompasses all documents describing the duties of K9 units, posting, assault response, and all other specialized units. While we believe these duties were revised in writing from time to time, documents describing the duties certainly must have been created when these special units were created.

6. Plaintiffs have produced numerous documents from an Enforcement Division executive or other executives to Agents, or to Agents and SPs, ordering changes in their tasks or duties or identifying areas of concern or emphasis about those tasks and duties. Many of these orders or other documents were meant for reading at roll call. It is doubtful, however, that Plaintiffs have a complete set and hence the City should produce them. This RFP also encompasses all documents describing the duties of K9 units, posting, assault response, and all other specialized units. While we believe these duties were revised in writing from time to time, documents describing the duties certainly must have been created when these special units were created.

7. In addition to all documents described in paragraph 5, performance reviews are responsive to this request. We are willing to discuss sampling of agents and years so the burden is not disproportionate.

8. In addition to all documents described in paragraph 5, performance reviews are responsive to this request. Again, we are willing to discuss sampling of agents and years so the burden is not disproportionate.

10. You apparently sent native data on summonses on October 10. We apologize but none of Plaintiffs' counsel accessed it before it closed on October 26. Please re-send the document.

15. OLR must have documents showing the differences between uniform and civilian pattern increases.

18. Plaintiffs_1080-2402 shows the results for the SW exam in 2015. The City undoubtedly has similar documents for the exams administered for Agent and SW candidates in later administrations of the exams, such as in 2019 and 2022 for SWs.

 

23, 24. Plaintiffs have produced Plaintiffs_000960-66, which is directly on point. But it is not a complete document and, more importantly, there would have had to be other documents generated around 1981 about the decision to create the Agent positions.

27, 32. For many years, the Oath Guidebooks did not purport to restrict Agents from issuing any types of summons, although two or three types of summons had to be issued in the presence of an SP because they involved impounding of vehicles. (*See, e.g*., Hunter_000656, Purser_000713-14, 804-09.) The 2023 and 2025 Oath Guidebooks, however, identify many types of summons that could be issued only by SPs, although Agents previously could issue those types of summons. (*See* Purser_000964-65; DSNY_000175-77.) DSNY must have documents internally discussing the reasons for such changes, most likely in 2022 and early 2023 but also probably in 2025. To the extent that DSNY claims that any of the documents are privileged, they need to be on a privilege log.

28. The NOE for the Sanitation Worker exam in 2023 allows candidates with at least three years of satisfactory work as an Agent to have preference for positions requiring this experience, presumably meaning SWs. (Hunter_000699-704.) I don't believe earlier NOEs had this provision. This request encompasses documents related to the development of this policy and to the fate of any Agents who availed themselves of this type of preference, as well as the applications of any Agents who applied directly for SP positions.

30, 31. The various announcements that the Agency was accepting applications from Sanitation Workers interested in working as SPs describe an interview process. We are confident that DSNY informed the interviewers over the years what qualities they were seeking in candidates and probably topics that they wanted the interviewers to explore. Documents with that type of information are encompassed within this request.

33. If the City is withholding documents responsive to request 33 based on one of the three types of privileges identified in its response, they City should produce a privilege log.

37. Agents and SPs do not randomly inspect portions of New York. First, except for those assigned to special units, they are assigned to specific boroughs. For many years, however, Agents were subject to periodic transfers between boroughs as a supposed anti-corruption measure. (See, e.g., Hunter_000184-87; Milan_000057; Milan_000100-03.) This RFP seeks documents related to that policy, including documents discussing whether to impose a similar transfer measure on SWs or SPs and whether to end the measure and, if so, why. Aside from the anti-corruption transfer policy, the documents suggest that the Enforcement Division exercised some control over the assignments of Agents and SPs within their boroughs (or parts of boroughs), instead of leaving it solely to the discretion of the sergeants or other supervisors. (See, e.g., Milan_000111.) The bi-weekly reports to the Commissioner cited above, and similar weekly reports (Milan_000112-16) should be produced because they reflect control over assignments at high levels of the Agency.

38. Agents and SPs did, at least on some occasions, work on joint projects. (Milan_000111, 000116.) The Agency should produce other documents relating to joint projects.

39. We are not seeking privileged documents, but the City has not identified any privilege applying to documents provided by OLR negotiators to union representatives or from union representatives to OLR negotiators. Those should be produced.

40. We understand that in connection with CBA negotiations, OLR estimates the cost to the City of proposed changes in employee benefits. The City should ask OLR for any such documents.

41. One potential reason for the differences in the racial and gender composition between Agents and SPs is the legacy points given to applicants for SW positions. (Plaintiffs_1080-2402.) The City should produce any documents reflecting the legacy points on other exams and related to the reasons for giving legacy points. It also should produce any documents related to other explanations for the demographic differences between occupants of the two positions.

44. Documents concerning any communications from the City Council or another City agency, such as the Equal Employment Practices Commission, to the DSNY about the disparities in compensation and racial/gender composition between Sanitation Police and Agents are not necessarily protected by privilege. Please produce any non-privileged responsive documents and, if the City withholds responsive documents based on privilege, please log it.

45. CBAs include memoranda of agreements that extend CBAs with modifications. There are additional CBAs and MOAs that the City has not produced.

<u>Second Set of Document Production Requests</u>

1. Plaintiffs do not believe that the Agency has no documents about decisions to stop hiring Agents or to reduce the number of Agents. In a footnote, Plaintiffs called the Agency's attention to the fact that, after a long history of hiring Agents every year but one, the Agency has hired Agents in only two years since 2017, with the last year in 2019. In addition, the adopted budget for FY 2023 included large increases in the number of Agents and the cost of enforcement but the actuality for 2023 and the plan for 2024 reduced the number of Agents and their pay compared to 2022. (Plaintiffs_000577-604.) The City should produce each of the documents referenced in that budgeting document as well as similar budgeting documents for at least each year from 2017 through 2025. Beyond that, it is not credible that the type of change that apparently occurred in 2022 was not accompanied by documents justifying the changes.

2. Plaintiffs know that the City possesses at least one set of emails concerning the ending of special patrol status for Agents. (Ortega_ 000062-67.) In those emails, Ayana Brooks states that she thought the special patrol status had been ended some time before. That belief likely came from other documents, which also should be produced.

3. Plaintiffs believe that the Agency recently has started training SPs in enforcement of recycling codes, inspecting the interiors of commercial establishments for violations of recycling laws, and violations committed by street retail businesses. If that is true, the Agency probably has documents explaining why only SPs should be trained on these types of violations.

 

5. Regardless of whether the City provides the training described above to SPs and not Agents, it is indisputable that only SPs (not Agents) are assigned to illegal dumping details, and possibly other details. Plaintiffs believe the Agency possesses documents discussing the reasons for this decision.

6. The City misconstrued this RFP in its responses. Plaintiffs want to know how many SPs have been assigned to special details, not how many SPs there may have been in total. DSNY certainly has documents showing those numbers, regardless of whether they are in spreadsheet form or exist only in hard copy. If the information exists only in the form of lists of SPs assigned to the special units, the City should produced those lists.

7. Plaintiffs understand that Patrick Cajamarca, the deputy chief of enforcement, recently authorized an Agent, Cesar Trinidad, to resume K09 undercover work, which had been stopped during the pandemic. Plaintiffs believe it almost certain that the Agency possesses documents concerning the decision to re-start this work and then to at least temporarily pause it again.

8. The City misunderstands the information that Plaintiffs seek in this RFP. Plaintiffs seek information on the number and identity of Agents assigned to special units, such as K9 or Postings. Plaintiffs are confident that the Agency must possess this information.

11. The City almost certainly is incorrect that it does not possess documents related to the reduction of overtime worked by Agents. A previously cited budgeting document (Plaintiffs_000577-604) shows $76,000 of overtime for Agents in 2022 but no overtime expenditures projected for Agents in 2023 and 2024. As explained above, the City should produce the budgeting documents for other years, but additionally, it should produce any documents that led to the decision to drastically reduce or eliminate overtime for Agents, as well as other related documents, such as documents discussing the impact of that decision, including increased OT for SPs or certain types of work not being performed at all.

12, 13. The Agency also certainly has many documents about FIAT's campaign to write complaints against Agents. Within a four-month period, FIAT filed over 130 complaints. (Plaintiffs_000420-25.) The Agency initiated the campaign with two emails to Agents about loitering. (Plaintiffs_000412; Plaintiffs_000413-14.) After the four months, FIAT essentially stopped its surveillance of Agents and preparation of complaints for any violation it could devise. If nothing else, the Agency has documents concerning each complaint and the subsequent proceedings. But the Agency undoubtedly orchestrated this type of campaign and the City should produce documents about the origination of the campaign, the proceedings and results, and the decision to stop it.

15. Plaintiffs have produced numerous documents that, if the City had produced them, would have been responsive to this RFP. (*See, e.g.*, Milan_000130, Milan_000131-38.) Plaintiffs don't doubt that the City has many responsive documents that Plaintiffs don't possess because, for example, directives were addressed only to SPs. The RFP states that Plaintiffs are willing to work with the City on a sampling approach to make this RFP manageable and Plaintiffs continue to be willing to do so.

We are open to discussing any of the RFPs identified above, or any other issues related to Plaintiffs' written discovery requests (including ESI search strings), with you if and when you think a discussion would be beneficial. Thank you.

Sincerely,

*Mike*